CLERK'S OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED

AUG 23 2016

JULIA C. DUDLEY, CLERK
BY: HMcDonald
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| JOVON DAVIS,<br>    Plaintiff, | ) <br> ) <br> ) | Civil Action No. 7:15-cv-00331 |
| v. | ) <br> ) | **MEMORANDUM OPINION** |
| STEVE CLEAR, <u>et al.</u>,<br>    Defendants. | ) <br> ) <br> ) | By:    Hon. Jackson L. Kiser<br>         Senior United States District Judge |

Jovon Davis, a Virginia inmate proceeding pro se, filed a civil rights complaint pursuant to 42 U.S.C. § 1983. Davis names Steve Clear, the Superintendent of the Southwest Virginia Regional Jail ("Jail"), and Mandi Smith, a licensed professional counselor and qualified mental health professional ("QMHP") at the Jail, as defendants. Davis argues that the lack of mental health counseling and the delays in meeting with psychiatrists at the Jail between December 2014 and July 2015 constitutes cruel and unusual punishment in violation of the Eighth Amendment of the United States Constitution.

After reviewing the record, I find that I must grant QMHP Smith's motion for summary judgment and Superintendent Clear's motion to dismiss. Even though Davis is dissatisfied with the speed and type of treatments provided at the Jail, he does not establish that QMHP Smith was deliberately indifferent to a serious medical need or that Superintendent Clear is liable in this case for an alleged Jail policy prohibiting mental health counseling.

I.
A.

Davis was incarcerated at the Jail in 2012, 2013, and 2014 before his more recent incarceration there between December 2014 and July 2015, which is the time at issue in this case. Davis' medical records from his prior stays detail his frequent need for mental health

treatment.[1] As early as August 2012, psychiatrists associated with the Jail had prescribed him Vistaril, Remeron, Risperdal, Neurontin, and Seroquel to treat Antisocial Personality Disorder, Major Depressive Disorder, Anxiety Disorder, and opiate and marijuana dependencies.[2]

At an appointment on April 16, 2013, a psychiatrist associated with the Jail noted in the medical chart:

> Inmate today reported that h[e] is depressed w/ crying episodes w/ anxiety. He also notes feeling increased feeling of dispar [sic] and hopelessness in [the morning] and passively suicidal with no intent of self harm. He endorses difficulty sleeping w/ nightmares. He denied any homicidal ideation, plans or intentions . . . .

Although the psychiatrist <u>ordered</u> changes to prescriptions, the psychiatrist only <u>recommended</u> that Davis join an anger management course. Davis again reported being "passively suicidal" with no intent of self harm nearly a year later in March 2014. At some point thereafter, Davis left the Jail and received out-patient medication management services from a private provider.[3]

**B.**

Davis returned to the Jail in December 2014. During his intake examination by a Jail nurse on December 2, 2014, Davis discussed his mental health diagnoses, treatment at the private provider, and prescriptions for Remeron and Vistaril. Davis denied thinking of suicide or ever attempting suicide. The nurse noted these statements in his medical records and referred Davis

---

[1] These facts are revealed in Davis' medical records attached in support of QMHP Smith's motion for summary judgment.
[2] Davis alleges in the complaint that he suffers from paranoid schizophrenia, but nothing in his medical records indicates that a doctor has diagnosed that disorder.
[3] Although Davis asserts that he received counseling twice a week from the private provider before returning to the Jail, the medical records contradict the allegation. The private provider's complete records sent to the Jail reveal that the private provider conducted a face-to-face psychiatric evaluation on October 23, 2014, and ordered a plan of treatment consisting of only medications. Davis returned to the private provider on November 19, 2014, for medication management and was re-incarcerated before returning to the private provider for another follow-up appointment.

2

to the Jail's mental health providers for follow-up. Jail staff administered the same prescriptions – Remeron and Vistaril – at different dosages after receiving a "complete copy of all records" from the private provider on December 15, 2014.[4]

On December 26, 2014, Davis filed a sick call request asking to see a psychiatrist due to his desire to receive different medications and his "violent," "real bad dreams." Davis explains that his dreams involved him killing his wife and brother, but this information was not disclosed in the sick call request.

Two weeks later, one of the Jail's QMHPs met with Davis on January 12, 2015, and "educated [Davis] on coping with agitation and anger in a correctional setting." A psychiatrist examined Davis that same day, noting the following information in Davis' medical chart:

> P[atient] is a 36 [year old] [African American male] with [history] of Mood [Disorder] [Not otherwise Specified], [Personality Disorder] [Not Otherwise Specified], polysubstantce use, [history] of suic[ide] attempts, who presents for return follow up. P[atient] has lengthy [history] of opiate, cocaine, THC use, as well as alcohol. C[u]rrently taking Remeron . . . and [V]istaril . . . . He reports the Remeron seems to help but overall he reports difficulty with mood regulation. Endorses feelings of frustration and irritability but does not seem able to expound more than that. Reports he has many stressors: mother, grandmother, [and] uncle have all died recently and his wife ran off with his brother and kids. P[atient] has been sentenced to 3.5 years which he was not expecting. P[atient] denies S[uicidal] I[deation]/H[omicidal] I[deation].

The psychiatrist ordered that a follow-up appointment be scheduled three months later in April 2015.

Nearly three weeks later on January 31st, Davis filed a request for mental health treatment, writing, "I'm requesting to speak or set an appointment with the psych Dr. ASAP . . . It's very urgent[.] Please help. Thank you very much." A week later on February 8th, Davis

---

[4] The private provider had prescribed 45 mg of Remeron and 25 mg of Vistaril, and Jail staff changed it to 30 mg for each prescription.

3

filed another request for mental health treatment, stating, "I'm starting to feel closed in and it hard [sic] to breath[e]. It's too small. This place is not condu[c]ive to my mental state. Help please." QMHP Smith replied to these two requests on February 16th, stating, "I'll see you very soon. Sorry to hear you are feeling that way," and "You are scheduled for a follow up visit with the psychiatrist in April. I will work you into the schedule to see him sooner than April, and I will meet with you prior to the appointment."

Davis filed an inmate request on February 25th, asking "to be evaluated and to speak to a counselor" about "very terrible bad dreams that cause [him] to wake up 8 to 9 times a night[.]" QMHP Smith responded the same day, noting Davis would be seen by a counselor and that he was already scheduled to meet with a psychiatrist.

Less than a week later on March 4th, a non-defendant QMHP met with Davis about his increased symptoms of nightmares, night terrors, and night sweats; waking up 8 or 9 times a night; dreaming about people he has never seen; and his belief that medicine is not helping. This QMHP "educated [Davis] on relaxation techniques to help with sleep disturbance[,]" and noted, "Patient will be seen at the discretion on [sic] Mandi Smith, Lead QMHP."

Nearly two weeks later on March 17th, Davis filed a request for mental health treatment:

> HELP! PLEASE! I do not know why you all is [sic] refusing me to see the psych[iatrist.] I am a sens[i]tive need inmate that is requesting to see the psych. It's been 90 days since I requested to see the psych as "an emergency[.]"[] My situation is worse than ever. I'm requesting to be transferred to a facility that is in tune[] with their mental health department.

QMHP Smith responded the next day, writing, "Seen by QMHP on 1/12/15, 3/4/15[.] Seen by psychiatrist on 1/12/15. Scheduled follow up visit in April per psychiatrist treatment plan."

4

On March 24th, Davis filed another request for mental health treatment:

> Please help. I need to see the D[octo]r. My meds is [sic] no longer assisting me with my nightmares. They are happening ever[y] night and is [sic] getting worse. I feel like I'm being denied medical attention. I've been pleading with the medical staff here in this facility. I feel the staff is making a joke out of my trauma in my life. Someone please help.

QMHP Smith responded on April 1st, explaining, "You are scheduled for a visit with the psychiatrist at the end of the month in April. I will work on getting you in to see him sooner."[5]

A non-defendant QMHP met with Davis on April 17th and wrote the following in Davis' medical record:

> [Davis] [d]enies ideations at this time but states, "I had[] S[uicidal] I[deation] thoughts a few weeks ago, but I had not plan [sic] and the thought went away." .... Patient waiting to be moved to DOC where he can receive counseling services and therapies that are offered through the DOC. The patient has been sentenced to 3 and 1/2 years .... The patient[']s mother died of cancer when he was 15 years old, and now his brother has moved in with his wife. The patient i[s] having a hard time dealing with circumstances in life. Denies S[uicidal]/H[omicidal] ide[a]tions.

Davis met with a psychiatrist via videoconference on April 22nd for the three-month follow-up appointment scheduled from January. The psychiatrist noted that Davis complained of "thoughts and feelings of frustration and irritability due to multiple stressors. H[istory] of 2 suicide attempts by overdoses of drugs." The psychiatrist modified the dosages of Davis' prescriptions and ordered that a follow up appointment be scheduled for two months later.

On April 24th, Davis wrote a letter to Donna Lawrence, a manager at the Virginia Department of Corrections ("VDOC"), complaining that he was not receiving adequate mental

---

[5] Davis filed another request on March 25th to the medical department reiterating his complaints about his nightmares and the perceived lack of quality mental health care. A medical nurse responded by noting the dates of Davis' last appointment with mental health staff and his future appointment to see a psychiatrist. The record does not indicate that this particular request was seen, or available to be seen, by QMHP Smith.

health treatment at the Jail.[6] Davis also filed a request with the Jail's mental health staff on April 27th, asking for counseling like he alleges he had received twice a week from the private provider.

The VDOC manager replied on May 1st, explaining:

> Please be aware medical staff at the [Jail] makes the decisions concerning your medical care while you are incarcerated. At any time the jail may contact the [VDOC] to request assistance with a state responsible offender whom they are unable to provide adequate medical care. The request must be from jail staff only.

On May 18th, Davis sent a request form to mental health staff, asking whether staff had requested Davis' transfer to a VDOC facility so he could get the counseling care he desired. QMHP Smith responded the same day, explaining, "I do not have any authority in housing or in legal matters with expediting to DOC. Sorry, I can't help you with this." QMHP Smith also replied to the April 27th request for counseling, explaining, "Mental health counseling or individual therapy is not a service available in the . . . Jail."

Davis commenced this action in June 2015 and was transferred out of the Jail and into VDOC custody in July 2015. Davis argues that QMHP Smith was deliberately indifferent to a serious risk of harm by delaying access to a psychiatrist or mental health counseling. Davis believes that Superintendent Clear is liable for the Jail's alleged policy of not providing mental health counseling and for not adequately supervising QMHP Smith.

---

[6] By this time, the VDOC ostensibly was responsible for Davis' incarceration although he was still housed at the Jail.

6

Case 7:15-cv-00331-JLK-RSB   Document 71   Filed 08/23/16   Page 6 of 11   Pageid#: 491

## II.
### A.

QMHP Smith filed a motion for summary judgment. A party is entitled to summary judgment if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact. Fed. R. Civ. P. 56(a). Material facts are those necessary to establish the elements of a party's cause of action. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A genuine dispute of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-movant. Id. The moving party has the burden of showing – "that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). If the movant satisfies this burden, then the non-movant must set forth specific facts that demonstrate the existence of a genuine dispute of fact for trial. Id. at 322-24. A party is entitled to summary judgment if the record as a whole could not lead a rational trier of fact to find in favor of the non-movant. Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991). "Mere unsupported speculation . . . is not enough to defeat a summary judgment motion." Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc., 53 F.3d 55, 62 (4th Cir. 1995). A plaintiff cannot use a response to a motion for summary judgment to amend or correct a complaint challenged by the motion for summary judgment. Cloaninger v. McDevitt, 555 F.3d 324, 336 (4th Cir. 2009).

### B.

Superintendent Clear filed a motion to dismiss. I must grant a defendant's motion to dismiss if I determine that the complaint fails to state a claim on which relief may be granted. Resolving this question under the familiar standard for a motion to dismiss under Federal Rule of

7

Civil Procedure 12(b)(6) requires me to accept Plaintiff's factual allegations as true.[7] Furthermore, a complaint needs "a short and plain statement of the claim showing that the pleader is entitled to relief" and sufficient "[f]actual allegations . . . to raise a right to relief above the speculative level . . . ." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (internal quotation marks omitted). Plaintiff must "allege facts sufficient to state all the elements of [the] claim." Bass v. E.I. Dupont de Nemours & Co., 324 F.3d 761, 765 (4th Cir. 2003). Dismissal under Rule 12(b)(6) is appropriate when, after accepting as true the well-pleaded facts in the complaint and viewing them in the light most favorable to the plaintiff, a court finds with certainty that a plaintiff would not be entitled to relief under any state of facts which could be proved in support of the plaintiff's claim. Brooks v. City of Winston-Salem, N. C., 85 F.3d 178, 181 (4th Cir. 1996).

### III.

A plaintiff must show that a defendant acted with deliberate indifference to a serious medical need to state a claim under the Eighth Amendment for the unconstitutional denial of medical assistance. Estelle v. Gamble, 429 U.S. 97, 104 (1976). Deliberate indifference requires a state actor to have been personally aware of facts indicating a substantial risk of serious harm, and the actor must have actually recognized the existence of such a risk. Farmer v. Brennan, 511 U.S. 825, 838 (1994). "Deliberate indifference may be demonstrated by either actual intent or reckless disregard." Miltier v. Beorn, 896 F.2d 848, 851 (4th Cir. 1990); see Parrish ex rel. Lee

---

[7] Determining whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Ashcroft v. Iqbal, 556 U.S. 662, 678-79 (2009). Although I liberally construe pro se complaints, Haines v. Kerner, 404 U.S. 519, 520-21 (1972), I do not act as an inmate's advocate, sua sponte developing statutory and constitutional claims not clearly raised in a complaint. See Brock v. Carroll, 107 F.3d 241, 243 (4th Cir. 1997) (Luttig, J., concurring); Beaudett v. City of Hampton, 775 F.2d 1274, 1278 (4th Cir. 1985); see also Gordon v. Leeke, 574 F.2d 1147, 1151 (4th Cir. 1978) (recognizing that a district court is not expected to assume the role of advocate for a pro se plaintiff).

v. Cleveland, 372 F.3d 294, 303 (4th Cir. 2004) ("[T]he evidence must show that the official in question subjectively recognized that his actions were 'inappropriate in light of that risk.'"). "A defendant acts recklessly by disregarding a substantial risk of danger that is either known to the defendant or which would be apparent to a reasonable person in the defendant's position." Miltier, 896 F.2d at 851-52. A health care provider may be deliberately indifferent when the treatment provided is so grossly incompetent, inadequate, or excessive as to shock the conscience or is intolerable to fundamental fairness. Id. at 851. A medical need serious enough to give rise to a constitutional claim involves a condition that "has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008).

QMHP Smith avers that she is a licensed professional counselor who provides psychiatric services at the Jail, including assessments, psychiatric referral, supportive counseling, and case management. Her job duties include meeting inmates personally for initial and follow-up interviews and to provide information to treating psychiatrists. In response to Davis' allegations, QMHP Smith avers:

> I am qualified to assess inmates to determine the level of psychiatric care they require, including whether to adjust scheduled appointments and arrange for immediate medical care. Based on my medical judgment, it was my opinion that Plaintiff's written requests and my assessments of him did not indicate a need to adjust his appointment schedule or to procure more frequent psychiatric care for him. He never presented to me as a psychiatric emergency. Plaintiff was provided with appropriate treatment and education to effectively address his mental health needs. I responded promptly to each of Plaintiff's medical concerns. Accordingly, in my medical opinion, Plaintiff has neither suffered harm nor is there an obvious or avoidable risk of future harm.

9

QMHP Smith Aff. ¶ 28. QMHP denies having the authority to control when the VDOC transfers an inmate from the Jail to a VDOC facility.

I find that Davis fails to establish QMHP Smith's deliberate indifference to a serious medical need. Davis' medical records do not evince a psychiatric emergency, a medical necessity to consult with a psychiatrist on his demand, or a medical order for Davis' preferred counseling services beyond what the QMHPs at the Jail already provided. See Iko, 535 F.3d at 241 (describing a serious medical need).

By February 16, 2015, QMHP Smith had received and replied to Davis' two requests for mental health, neither of which would alert her or her staff to a mental health emergency. Prior to this time, Davis' medical records reflected that he had already seen a psychiatrist, been receiving mental health prescriptions, and consistently denied any having suicidal or homicidal ideation. Although QMHP Smith did not follow through with her assertion to personally "see [Davis] very soon" between February 16 and April 22, 2015, Davis met with a QMHP who evaluated and counseled Davis twice during that time period. Nothing from these two evaluations, nor Davis' own request forms, would indicate that Davis was experiencing suicidal or homicidal thoughts or a medical emergency. Davis told a QMHP on April 17, 2015, that he had suicidal thoughts a few weeks earlier, but this fact was not available to QMHP Smith until April 17th, by which time Davis said the suicidal thoughts had dissipated. Even Davis' request dated March 17, 2015, did not sufficiently notify QMHP Smith of a medical emergency to which she could be deliberately indifferent. Indeed, Plaintiff acknowledges that he never made a specific threat of harm and did not have the means to act on any threats of harm due to his incarceration. (ECF No. 61 at 9.)

Davis has not established that the care provided or scheduled by QMHP Smith was so grossly incompetent, inadequate, or excessive as to shock the conscience or was intolerable to fundamental fairness. Davis' disagreements with the speed and manner of the mental health treatments provided by QMHP Smith or other Jail mental health staff do not afford relief via § 1983. Estelle, 429 U.S. at 105-06; Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985); Russell v. Sheffer, 528 F.2d 318, 319 (4th Cir. 1975). Plaintiff's arguments that QMHP Smith negligently screened or treated his mental states also do not afford relief under § 1983. Estelle, supra. Accordingly, I must grant QMHP Smith's motion for summary judgment.

Davis believes Superintendent Clear is liable for an alleged Jail policy that does not allow mental health counseling services at the Jail and for not adequately supervising QMHP Smith. There is nothing in the record suggesting that a medical professional prescribed counseling as a medically necessary treatment for Davis' mental illnesses, and consequently, there is no support for an inference that an alleged Jail policy or practice prevented Davis from receiving counseling services beyond what the QMHPs already provided. Davis fails to establish Superintendent Clear's fault as a supervisor or for an alleged policy or practice. See, e.g., City of Canton v. Harris, 489 U.S. 378, 388-92 (1989); Monell v. Dep't of Soc. Servs., 436 U.S. 658, 663 n.7, 694 (1978). Accordingly, I must grant Superintendent Clear's motion to dismiss.

## IV.

For the foregoing reasons, I grant the defendants' motions to dismiss and for summary judgment.

ENTER: This 23rd day of August, 2016.

*Jackson L. Kiser*
Senior United States District Judge